[Williams, Deacon & Co. v. Jones.]

# Williams, Deacon & Co. *v.* Jones.

*Bill in Equity by Assignee of Insolvent Bank, asking Instructions in matter of Trust; Cross-Bill by Creditors claiming Preference.*

1. *Payment of bill as between drawer and discounting bank.*—When a bank has discounted a bill of exchange for the drawer, and still retains the ownership and control of it, an acceptance of a conveyance of property from the drawer, in absolute discharge of his liability, extinguishes the bill as a legal liability.

2. *Indorsement for collection.*—An indorsement of a bill or note for collection only—as by the words, "Pay to W. D. & Co., *for account of* Bank of Mobile," accompanied with a letter of advice that the bill was remitted for the credit of the remitting bank—does not change the ownership of the bill or note, but it remains the property of the remitting bank.

3. *Advancing money on faith of bill so held.*—If the bank to whom a bill or note is thus remitted for collection, having the possession, on the faith and credit thereof advances money to the remitting bank, or accepts its drafts in anticipation of the collection, either by express agreement, or in accordance with the usual course of dealing between them; as to whether it thereby acquires a lien on the bill or note, or an interest therein which will support its custody as rightful against the remitting bank, until the advance or acceptance is repaid, see authorities cited.

4. *Wrongful payment, and ratification thereof.*—If the drawer of the bill, having notice of the fact that the discounting bank has transferred it for collection to its business correspondent, and that the latter has acquired a lien by advancing money on the faith of it before maturity, pays the bill to the discounting bank, the payment is wrongfully made, and wrongfully accepted, and does not discharge the drawer from liability to the bank or person having the lien, unless ratified; and if the payment was made in property, which remains in specie, the discounting bank holds such property in trust for its correspondent, if the latter elects to ratify the payment.

5. *Same; election.*—When a party has a right to elect whether he will ratify or disaffirm a wrongful payment, he must either ratify or disaffirm it as an entirety: he can not, while suing the original debtor, maintain an action against the person to whom the money was paid, or fasten a trust on the property received by him in payment; though, if the property was merely received as collateral security for the debt, he may pursue it in equity, and at the same time maintain an action at law against the debtor.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. JOHN A. FOSTER.

The original bill in this case was filed on the 29th August, 1884, by Winston Jones, as assignee, or trustee, in a deed of assignment executed by the Bank of Mobile for the benefit of its creditors, against the said corporation and its creditors; ask-

[Williams, Deacon & Co. v. Jones.]

ing that the court would take jurisdiction of the trust, instruct the complainant in the discharge of his duties, require all the creditors to come in and propound their claims, settle all conflicting liens and claims, and administer the assets as required by law and the rules of equity.

The Bank of Mobile was first chartered, under the corporate name of the "president, directors and company of the Bank of Mobile," by an act of the Territorial Legislature, approved November 18th, 1818; but its corporate existence was continued, under a new and amended charter, by an act approved December 14, 1876. The deed of assignment, a copy of which was made an exhibit to the bill, was dated the 8th July, 1884; and conveyed all the property and assets of the bank to said Winston Jones, as trustee, "for the benefit of all the creditors of said bank, without preference to any creditor, or class of creditors, unless by law there is or shall be a preference given in any particular case, which would operate to control the action of the said assignee in such particular premises." A list of the individual depositors of the bank, over four hundred in number, was appended to the bill as an exhibit, and it was alleged that the property and assets conveyed by the assignment were worth nearly $500,000.

Among the property conveyed were two large tracts of land, one situated near the city of Mobile, and the other in Jackson county, Mississippi, on each of which a valuable saw-mill with appurtenances was situated; and there was a large quantity of logs and lumber, of the estimated value of $80,000. This property was taken by the bank, as the bill alleged, from the Danner Land and Lumber Company, a private corporation, of which A. C. Danner was the president and principal stockholder, "at an aggregate value of $162,000, in settlement of a debt due from said company to said bank for certain discounts and overdrafts, and also in settlement of certain sterling exchange drawn by said company, at Mobile, on George Shadboldt & Son, London, England, to an amount exceeding $100,000; and which exchange had been bought by said bank, and had been accepted, as orator is informed and believes, and so avers, by said Shadboldt & Son, but which acceptances, at the time of said settlement, your orator charges on information and belief, said Shadboldt & Son were unable to meet." A claim to this property, the bill alleged, was asserted by Williams, Deacon & Co., a banking house in London, as the holders of said accepted foreign bills, the averments as to their claim being in these words: "For some years past, said bank had business connections with said Williams, Deacon & Co., and at the time of said assignment, as your orator avers on information and belief, was indebted to them in a large sum, the

exact amount of which, pending the adjustment of the account, your orator is unable to give.    But your orator shows that, at the time of said assignment, said drafts of the Danner Land and Lumber Company, accepted by said Shadboldt & Son, were held by said Williams, Deacon & Co., and that said acceptances have been, in whole or in part, protested.    Your orator does not know the exact title or legal interest of said William, Deacon & Co., in said drafts; but he is advised and believes that said bank, prior to said assignment, assumed to pay said drafts, and would have done so, as your orator believes, but for the failure of said bank as aforesaid.    Said Williams, Deacon & Co. claim, by their attorneys, as your orator shows on information and belief, that the amount of said drafts so held by them are the first lien on, or are entitled to a preference of payment out of the proceeds which may be realized by your orator from the sale of said property so taken from said Danner Land and Lumber Company ; but your orator knows of no fact or equity upon which said claim, or said drafts in whosoever hands they may be, can be charged as a first lien on, or be held entitled to preference out of the proceeds of said property."

Williams, Deacon & Co. thereupon filed an answer and cross-bill, the material parts of which, or the substance thereof, are as follows :    (1.) Respondents have been carrying on a banking business in London for many years, "and have had dealings with said Bank of Mobile for over forty-five years; but said dealings were thought by them to be secured by the bank remitting to them collaterals to cover their drafts, as hereinafter stated; besides, they had confidence in the integrity of the bank officials, and in the solvency of the corporation." (2.) The Danner Land and Lumber Company, a private corporation under the laws of Alabama, was largely engaged in the manufacture and shipment of lumber and sawn timber for English and European markets ; and it drew sundry bills of exchange on George Shadboldt & Son, wood-brokers, residing and doing business in London, to whom it also shipped cargoes of lumber and limber.    "Said bills were drawn at sixty days after sight, and were duly accepted by said Shadboldt & Son on presentation.    At the time said bills were drawn, said Danner was also president of said Bank of Mobile, and was actively engaged in the management of the affairs of said bank, as well as of said corporation.    J. C. Strong, the secretary and treasurer of said company, drew said bills, by the instructions of said Danner, in large amounts, and at short intervals.    These bills were lodged in the Bank of Mobile by said Danner, president of said company, and were ordered to be discounted by him as president of said bank, and the proceeds to be placed to the credit of said company ; and said Danner, as president of

said bank, ordered and directed said bills to be remitted to Williams, Deacon & Co., to be collected at maturity, and at the same time, as president of said bank, ordered and directed that bills of exchange be drawn by said bank, generally at sixty days, and sometimes at sight, on Williams, Deacon & Co., to cover amount of said bills; and further ordered, that whenever, by the regular course of the business of the bank, foreign exchange was not sold in sufficient amount to cover these bills, that said bank should then draw exchange in its own favor on respondents, and send the same to its correspondent bank in New York, in sufficient amounts to cover any balance on said bills which might at maturity come into the hands of Williams, Deacon & Co., on payment of said bills. This was done, and all such exchange was paid by respondents; and large sums of money were thus drawn from respondents, and deposited in New York, on which said bank drew its domestic exchange." (3.) If this course of dealing was not expressly ordered by said Danner in his official capacity, it was done by his subordinate officials, with his knowledge and consent, and was ratified by him; and said lumber company "got the full benefit thereof, and these respondents paid all said drafts of the bank, to the full amount of said foreign bills which they were drawn to cover." (4.) "In furtherance of this scheme, as president of both corporations, to obtain money from these respondents to keep up said lumber company, and to keep said bank in funds, said Danner caused said bills to be drawn at sixty days after sight, and procured their acceptance by said Shadboldt & Son, to whom said company consigned its lumber and timber sent to England for sale." (5.) Said bills, now unpaid, amount in United States currency to $110,226.23, besides interest, which were thus discounted by said bank, and sent to these respondents, who are *bona fide* holders thereof for value paid and advanced to said bank before the maturity of said bills." (6.) After said bills had been thus drawn, discounted, and accepted, and after these respondents became the holders thereof for value, and after said bank had drawn for the full amount thereof on these respondents, and they had paid the same, said Shadboldt & Son announced their determination, about the 9th July, 1884, not to pay the same to respondents, stating that they had received instructions from the bank and the company not to pay, as certain transactions had occurred between them, as drawer and indorser of the bills, by which the bank had assumed to pay the bills, and had released the drawer and acceptors from liability. "Respondents at once denied the right of said bank and said lumber company to make any contract whereby the rights of respondents, who were then and now the *bona fide* holders for value of all said bills,

could be affected or impaired, without their consent. Said
bills were, at that time, all in the hands of respondents, and
held by them against exchange drawn by said bank and paid
by respondents. Neither said bank nor said lumber company
ever demanded said bills of respondents, nor undertook to con-
trol them, or claimed the right to control them." As said bills
matured, they were protested, and respondents notified all the
parties that they would look to each of them for payment.
(7.) The transactions between the bank and the lumber com-
pany, which resulted in the execution of the latter's convey-
ance of the property, are stated on information and belief.
(8.) The bank took the property in payment of the liability of
the lumber company, "the bank being ultimately liable to pay
said foreign bills, having passed them to respondents prior
thereto, and drawn the full amount thereof in advance of their
maturity. As soon as said sale and conveyance were made,
said Danner, as president of said two corporations, notified said
Shadboldt & Son, the acceptors, not to pay any of said bills at
maturity, asserting that the drawer had paid here; he well
knowing, as president of said bank and said lumber company,
that respondents held said bills, and that said bank had drawn
its exchange to the full amount of the proceeds thereof, and
that respondents had paid the same, and that said bank had the
money in its coffers, or under its control, and that respondents
were the *bona fide* holders for value of all of said bills; and that
the indorsement thereon by said Manly, cashier, was only the
form he had put thereon to identify the sender on the face of
the bill, which was done with the knowledge and direction of
said Danner, and that said form only meant that, if said bills
were paid, said bank would be entitled to a credit therefor on
its exchange account with these respondents; and that these
bills were remitted to these respondents for the purpose of be-
ing held by them as their property, and the proceeds, if col-
lected, to be credited on said exchange account. Accompany-
ing each of said bills, as the same was remitted by first mail
after discount thereof by the bank, the said bank, by R. F.
Manly, its cashier, inclosed the same in its letter of advice, in-
forming those respondents that each of said bills was remitted
for its credit. Respondents agreed to receive them for its
credit, and so entered them on their books, and have ever
since held them as their property; and such was the course of
dealing between said bank and these respondents." (9.) "Said
bank thus received from the drawer of said bills payment of
the same in property, after the assignment of said bills to these
respondents, and contracted for said consideration to release
the drawer from liability, after said bank had assigned said
bills to these respondents, and had received from them full

value therefor; and said bank thereby made itself the trustee of these respondents in reference to said property, and liable to account to them for the full value thereof; and said Jones, said assignee, was then and there a director of said bank, and was one of the persons appointed by it to negotiate and receive said property for it, and was active in said transaction, and participated in the same in all its details, and had full knowledge of the whole transaction, and took said property by said assignment charged with said trust." (10.) All the property conveyed by the deed of said Danner Land and Lumber Company "was its exclusive property, and was conveyed by it for the express and only purpose of paying its liability to said bank, as evidenced by these foreign bills. All the balance of the liabilities of said company was in the shape of discounts and over-drafts held and owned by said bank, which were surrendered at the time of the delivery of this property; but, these foreign bills not being held or owned by said bank, which said Danner well knew, said bank never undertook to surrender or deliver the same, and was powerless to do so, if it had, save by paying to respondents the amounts thereof."

On these allegations, the claim and prayer of said complainants in the cross-bill was thus stated: "The facts above set forth, which these respondents are ready to verify, give them a prior equity over other creditors of said bank, on the said property, for the satisfaction of their said claim, because said Danner Land and Lumber Company was the common debtor of said bank and these respondents at the time said property was conveyed to the bank for the purpose of paying said debt. Respondents deny that the depositors of said bank have any preference of payment, in law or in fact, over them, out of the other assets of the bank so alleged in said bill; and they claim that said assignee, by virtue of his authority under said deed of assignment, should pay them, on their said claim, the same percentage as depositors and note-holders, after first selling said real estate, logs and lumber, and applying the same to the payment of said debt. Respondents have brought suit, in the Queen's Bench in London, England, against said Shadboldt & Son as the acceptors of said bills, and against said Danner Land and Lumber Company, as drawers of said bills, in the Circuit Court of the United States for the Southern District of Alabama; which said suits at law are now pending, and when said trustee sells said property, and applies the proceeds thereof to the payment of said bills, said drawer and acceptors will then be entitled to a credit to the extent of the payment so made on their aforesaid liabilities. ... Respondents therefore pray, as complainants in this cross-bill, that said Jones be held and treated as a trustee for them, as to all of said property so

conveyed to said bank by the Danner Land and Lumber Company; and that he be directed to sell the same, and pay over to your orators, or to their solicitors, the proceeds thereof, or so much thereof as these bills are in proportion to the whole value of the property, or the amount realized thereon ; and that he be required to account to them for any of said property heretofore sold, or the rents, income, and profits thereof ; . . .and if said property be insufficient to pay said sum to your orators, that said assignee be directed to pay them the balance thereof out of the other assets of said bank, unless, in the meantime, said balance, if any, be paid by said drawer or acceptors of said bills."

The indorsement of each of the bills was in these words : " *Pay to Williams, Deacon & Co., for account of the Bank of Mobile ;*" which was signed, " *R. F. Manly, cashier.*" The letter of advice accompanying each bill, which was also signed by said Manly as cashier, was in these words : "*I inclose for our own credit, 17, 613, George Shadboldt & Son, £1,800. Second of exchange will follow. Please report by number.*" It appeared, also, from the statements of the cross-bill and exhibits thereto, that the Bank of Mobile had an open credit with Williams, Deacon & Co., to the amount of £10,000, for which they held, as collateral security, Alabama bonds, class No. 2, to the amount of $60,000.

The chancellor sustained a demurrer to the cross-bill, and dismissed it ; and his decree is now assigned as error.

OVERALL & BESTOR, for the appellants.—(1.) The original parties to the transactions here involved are before the court, and the rights of no third parties are concerned. On the allegations of the bill, which are admitted by the demurrer, the property was conveyed to the bank, and was accepted by it, for the express purpose of discharging the drawer's liability on these foreign bills ; and this was done before the maturity of the bills, and when both of the parties knew, Danner being the president and principal manager of each corporation, that the bank had already realized the amount by exchange drawn on the appellants, and that the bills were held by the appellants as security for the money thus advanced on the faith of them. The bank had already received payment of the debt, when it sold its exchange on appellants ; and when it received this property in discharge of the debt, it was bound to apply the proceeds for that purpose. A court of equity will hold the bank and its assignees chargeable as trustees for the benefit of the holders of the bill, without regard to the form of the agreement. The trust arises by implication of law, from the nature of the transaction.—*Newlin v. McAfee*, 64 Ala. 365 ; *Powell*

[Williams, Deacon & Co. v. Jones.]

*v. Jones,* 72 Ala. 398; *Ellis v. Amason,* 2 Dev. Eq. 278; 2 Fonb. Eq. 623; 1 Perry on Trusts, §§ 243, 247, 438; 2 Story's Equity, §§ 1264-5; *Fortescue v. Barnett,* 3 My. & K. 36. The property can not be held by the assignee, except as a trustee for the owner of the debt; and his refusal to apply it for that purpose would constitute a fraud, out of which a court of equity raises a trust.—*Patton v. Beecher,* 62 Ala. 590. If the bank had remained solvent, and had refused to pay the debt, Williams, Deacon & Co. might have maintained an action at law against it (*Seaman v. Hasbrouck,* 35 Barbour, 151); and the insolvency intervening, they may follow the specific property in equity. (2.) Williams, Deacon & Co. had possession of the bills, claiming to be *bona fide* holders for value, having advanced the full amount to the bank; and the latter made no attempt or promise to deliver them, either to Shadboldt & Son, the accommodation acceptors, or to the Danner Company; nor did the latter stipulate for their delivery, Danner well knowing all the facts. Possession is evidence of ownership, and a party who makes payment to one who has not the possession, acts at his peril, and is not discharged from liability to the holder.—2 Dan. Neg. Instr. § 1228; *Fellows v. Harris,* 12 Sm. & Mar. 462; *Emanuel v. White,* 34 Miss. 56; *Mercier v. Cotton,* 34 Miss. 64; *Goodman v. Simond,* 20 Howard, 343; *Comm'rs v. Clark,* 94 U. S. 285; *In re Tallassee Man. Co.,* 64 Ala. 593; *Collins v. Gilbert,* 94 U. S. 754; *Davis v. Miller,* 14 Gratt. 10. (3.) The bills were not only sent for collection, but, as the accompanying letter of advice stated, "for credit," the collection having already been anticipated; and by the course of dealing between the parties, as shown by the allegations of the cross-bill, Williams, Deacon & Co. had the right to hold them until reimbursed.—*Sweeney v. Easter,* 1 Wallace, 166; *Brown v. Jackson,* 1 Wash. 515. (4.) Even if the bills were remitted for collection only, Williams, Deacon & Co. had a banker's lien upon them, which made them holders for value as against the bank and the drawer.—Morse on Banking, 42-3; *Maitland v. Nat. Bank,* 40 Md. 540; *Lehman Bros. v. Tallassee Man. Co.,* 64 Ala. 595. As holders for value, they are entitled to protection against all subsequent transactions between the prior parties.—*Boykin v. Bank,* 72 Ala. 271; *Miller v. Boykin,* 70 Ala. 469; *Connerly v. P. & M. Bank,* 66 Ala. 432; *Swift v. Tyson,* 16 Peters, 1; *Collins v. Gilbert,* 94 U. S. 753. (5.) That an appeal will lie in this case, see *Winn v. Dillard,* 60 Ala.   ; *Brooks v. Woods,* 40 Ala. 538; *Trustees v. Greenough,* 105 U. S. 527.

GAYLORD B. CLARK, for the Bank of Mobile and its assignee, Jones; J. L. SMITH, T. A. HAMILTON, and HANNIS TAYLOR,

[Williams, Deacon & Co. v. Jones.]

for creditors and depositors of the bank; and PILLANS, TORREY & HANAW, for the Danner Land and Lumber Company, submitted oral arguments and printed briefs, in which the following points were made, and the following authorities cited: (1.) The indorsement of the bills by the bank to Williams, Deacon & Co , was for collection only, and neither changed the ownership of the bills, nor conferred any rights on Williams, Deacon & Co. as against the bank.—1 Danl. Neg. Instr. §§ 666 69; *Nat. Bank v. Reno County Bank*, per McCRARY, J., 3 Fed. Rep. 257; *Hook v. Pratt*, 78 N. Y. 371; *White v. Bank*, 102 U. S. 658; *Sweeney v. Easter*, 1 Wallace, 166; Edwards on Bills & Notes, § 277; 3 N. Y. 494; *Atkins v. Cobb*, 56 Geo. 86; *Lloyd v. Sigourney*, 5 Bing. ; *Claflin v. Wilson*, 51 Iowa, 15; 21 Minn. 383; 2 Murph. N. C. 138; Chitty on Bills, 258-61; 2 Burr. 1227; *Wilson v. Holmes*, 5 Mass. 543; *Truettel v. Barandon*, 8 Taunton, 100; *Blaine v. Bourne*, 11 R. I. 119; *Mech. Bank v. Valley Pack Co.*, 4 Mo. App. 200.    (2.) Neither the letter of advice, nor the course of dealing between the parties as alleged, changed the legal effect of the indorsement; nor could it be changed by any parol evidence or custom.— *Giles v. Perkins*, 9 East, 12; *Scott v. Ocean Bank*, 23 N. Y. 289; *White v. Nat. Bank*, 102 U. S. 660; *Day v. Thompson*, 65 Ala. 269; *Preston v. Ellington*, 74 Ala. 133; *Cowles v. Townsend*, 31 Ala. 133; *Hightower v. Ivey*, 2 Porter, 308; *Carleton v. Fellows*, 13 Ala. 437; 1 Wait's Ac. & D. 593-97; *Tucker v. Fairbanks*, 98 Mass. 102; *Bartlett v. Hawley*, 120 Mass. 92; *Tankersley v. Graham*, 8 Ala. 250; 8 Taunton, 92.    In this connection it must be remembered that the demurrer admits the allegations of the bill only so far as they are well pleaded, and the averment of a legal conclusion can not be treated as a statement of fact.—*Goldsby v. Goldsby*, 67 Ala. 562; *Cockrell v. Gurley*, 26 Ala. 408; *Gilchrist v. Shackelford*, 72 Ala. 13; *Rapier v. Paper Co.*, 64 Ala. 340. (3.) No express trust, created by the agreement of the parties, is claimed, or alleged; and none arises by implication of law from the facts stated.—1 Perry on Trusts, §§ 73, 133, 165; 7 Conn. 478; 20 Conn. 427.    If the property had been received, not in absolute payment, but as security for the debt, they might have compelled its appropriation for that purpose.—19 Ala. 798; 16 Ala. 417; 60 Ala. 555; 67 Ala. 425.    (4.) But, if any trust might be implied in favor of Williams, Deacon & Co. at their election, they have lost the right to claim it.    They have brought actions at law against the drawer and the acceptors of the bill, and can not at the same time pursue the property, thereby ratifying the payment.—Wharton on Agency, §§ 72, 78, 89; 2 Perry on Trusts, 600; 1 Wait's Ac. & D. 232; 27 Mo. 163; *Widner v. Olmstead*, 14 Mich. 124; *Lehman v. Meyer*, 67

[Williams, Deacon & Co. v. Jones.]

Ala. 403; *Moog v. Talcott*, 72 Ala. 211; *Micou v. Ashurst*, 55 Ala. 612; *Rives v. Walthall*, 38 Ala. 382; *Hatchett v. Blanton*, 72 Ala. 423.

STONE, C. J.—Williams, Deacon & Co. are bankers in the city of London, England, and as such have been business correspondents of the Bank of Mobile for more than forty years. The cross-bill makes substantially the following case; One line of the business of the Bank of Mobile has been the purchase by discount of bills of exchange payable abroad, which, when collected, produced and placed a fund, on which the Bank of Mobile drew and sold foreign exchange. It has long been in the habit of remitting its purchased bills, payable abroad, to Williams, Deacon & Co., indorsed to them for collection, and has also been in the habit of drawing on them in the sale of foreign exchange, which drafts the said foreign bankers honored and met. The practical working has been, that the Bank of Mobile paid out its money in the discount and purchase of such bills, and received it back, *plus* the profits of the two operations, when it sold exchange against the proceeds of the bills. Williams, Deacon & Co. realized funds, the property of the Bank of Mobile, when they collected the bills thus remitted to them for collection; and they discharged the liability and accounted and repaid to the Bank of Mobile, when they honored and paid the checks or drafts of the latter, in amount equal to the sum of the collections. Strong confidence had grown up between the parties, and Williams, Deacon & Co. would and did honor and pay drafts drawn on them by the Bank of Mobile, before the maturity, and consequently before the collection of such bills remitted to them for collection; and when, in the fluctuations of trade, a surplus of collections accumulated in the bank of Williams, Deacon & Co., not wanted to meet the demand for foreign exchange, the Bank of Mobile would and did transfer such surplus from Williams, Deacon & Co. to its correspondent bank in the city of New York, U. S., as a fund against which to issue its domestic exchange.

The averred facts in reference to the particular transaction, on which the cross-bill is sought to be maintained, are as follows: There was a private corporation, known as the Danner Land and Lumber Company, engaged in the manufacture and shipment of lumber to foreign markets. A. C. Danner was president of the company, and was the largest stockholder. He was also president of the Bank of Mobile. Shadboldt & Son, wood-brokers in London, England, were brokers for the sale of the lumber and timber shipped by the Danner Land and Lumber Company to that market. They were also in the habit of accepting the bills of exchange drawn by said Lumber Com-

pany. Commencing on the 10th May, 1884, and ending on the 19th of June next afterwards, the Danner Land and Lumber Company drew its fifteen bills of exchange on Shadboldt & Son, for an aggregate sum which amounted to about one hundred thousand dollars in American currency. These bills became due and demandable at an average of about seventy-five days after their several dates, beginning July 26, and ending September 5, 1884. They were accepted by Shadboldt & Son. The averment of the cross-bill, as to what was done with these bills, is as follows : " These bills were lodged in the Bank of Mobile, by A. C. Danner, president of the Danner Land and Lumber Company, and were ordered to be discounted by said Danner as president of said bank, and the proceeds to be placed to the credit of his Land and Lumber Company ; and said Danner, as president of the Bank of Mobile, ordered and directed said bills to Williams, Deacon & Co., to be collected at maturity, and at the same time ordered and directed, as president of said bank, that bills of exchange be drawn, generally at sixty days, and sometimes at sight, by said bank on Williams, Deacon & Co., to cover amount of said bills : and further ordered that, whenever, by the regular course of the business of said bank, foreign exchange was not sold in sufficient amount to cover these bills, that said bank should then draw exchange in its own favor on respondents [Williams, Deacon & Co.], and send the same to its correspondent bank in New York, in sufficient amounts to cover any balance on said bills, which might at maturity come into the hands of Williams, Deacon & Co., on payment of said bills. This was done, and all such exchange was paid by respondents. Large sums of money were thus drawn from respondents and deposited in New York, on which said bank drew its domestic exchange." The averments of the cross-bill are not always as specific as could be desired ; but the effect of the foregoing, and other averments not necessary to be copied, is, that based on these fifteen bills of exchange, accepted by Shadboldt & Son, so remitted by the Bank of Mobile to Williams, Deacon & Co., the remitting bank, in anticipation of the maturity and collection of the bills, had drawn on Williams, Deacon & Co., and thus realized the entire sum to be collected from Shadboldt & Son, on their acceptances of said bills ; and this before there was any known trouble in the financial affairs of the Bank of Mobile.

The cross-bill further sets forth that, including these fifteen bills of exchange so discounted by the Bank of Mobile, the Danner Land and Lumber Company owed the bank one hundred and sixty-two thousand dollars, which the Land and Lumber Company, about July 1, 1884, paid, satisfied and discharged to the Bank of Mobile, by conveyance of real and personal

property, in full satisfaction of said entire liability. By this averred transaction, if true, the Land and Lumber Company was no longer liable to pay the said fifteen bills, or any part of them, to the Bank of Mobile; and if the said bills were then the property of the bank, and under its control, with authority to receive payment, the bills were thereby paid, and extinguished as a legal liability.

Williams, Deacon & Co. claim that, before said bills of exchange became due, they became their property by *bona fide* purchase, and the Danner Land and Lumber Company and the Bank of Mobile had no authority to make and accept said alleged payment to the Bank of Mobile. The indorsement of the said bills by the Bank of Mobile was in the following words : " Pay to Williams, Deacon & Co., for account of Bank of Mobile." The cross-bill alleges that, " accompanying each of said bills, as the same was remitted by the first mail after the discount thereof by the bank, the said bank, by its cashier, R. F. Manly, inclosed the same in its letter of advice, informing complainants that each of said bills was remitted for its credit; that complainants agreed to receive them for its credit, and so entered them on their books, and has ever since held them as their property."

As we understand the averments of the cross-bill, the bills did not pass into the hands of Williams, Deacon & Co. as purchasers, but as agents to collect. Such is the import of the restrictive indorsements placed on the bills. The bills then, if there be nothing else in the transaction, remained the property of the Bank of Mobile, and could have been recovered by it from Williams, Deacon & Co., if it had chosen to assert its right.—*Ex parte Pease*, 19 Vesey, 25 ; 1 Dan. Neg. Sec. § 698 ; *Sweeny v. Easter*, 1 Wall. U. S. 166 ; *White v. Nat. Bank*, 102 U. S. 658 ; *Blaine v. Bourne*, 11 R. I. 119 ; *Trentel v. Barandon*, 8 Taunt. 100 ; *Wilson v. Holmes*, 5 Mass. 543 ; *Hook v. Pratt*, 78 N. Y. 371 ; *Atkins v. Cobb*, 56 Ga. 86 ; *Edie v. East India Co.*, 2 Burr. 1216, 1227 ; *Brown v. Jackson*, 1 Wash. Cir. Ct. 512 ; *Tucker Man. Co. v. Fairbanks*, 98 Mass. 101 ; *Mech. Bank v. Valley Packing Co.*, 4 Mo. App. 200 ; s. c., 70 Mo. Rep. 643.

The transaction, however, did not end here, if the averments of the cross-bill be true. Based on the possession of these accepted bills, soon to mature, and, as was confidently expected, soon to be collected, and based on the letter of advice and course of dealing between the parties, Williams, Deacon & Co. had permitted the Bank of Mobile to anticipate the collection, and, through its drafts, to realize the proceeds of the bills before their maturity or payment. Is this distinguishable, in principle, from any other advance of money, procured on the faith

20

[Williams, Deacon & Co. v. Jones.]

of collaterals held by, or deposited with the lender? Has not the lender a lien on the collateral, which will maintain his rightful custody against the borrower, until the advance or loan is reimbursed? Could the Bank of Mobile, after its advance-draft and realization of the proceeds of the bills, have recovered them from Williams, Deacon & Co., without first repaying to them the sum advanced by them on the faith of their collection? And does Winston Jones, the assignee, stand in any better right, than the Bank of Mobile, his assignor? He is the mere transferree of the title, for the benefit of creditors, and is not a purchaser in the sense which will cut off equities between the parties, although unknown to him. We have asked the questions above, with no intention of answering them. The reason will be stated further on.—Morse on Banking, 42-3; Perry on Trusts, §§ 161, 243; *Mich. St. Bank v. Gardner,* 15 Gray, 362; *Ullman v. Barnard,* 7 Gray, 554; Story's Equity, § 1265; *Patton v. Beecher,* 62 Ala. 579; *Tankersly v. Graham,* 8 Ala. 247; *Newlin v. McAfee,* 72 Ala. 357; *Powell v. Jones,* 72 Ala. 392; *Ellis v. Amason,* 2 Dev. Eq. 273; *Legard v. Hodges,* 1 Vesey, 477.

There is another line of inquiry, cognate to that raised above. Taking the averments of the cross-bill for our guide, the Danner Land and Lumber Company was the principal debtor on the said fifteen bills, which gave rise to the present controversy. To it the consideration moved, and Shadboldt & Son were its accommodation acceptors. On it rested the duty of exonerating all other parties to the bills. Before the alleged payment of said bills by the said company to the Bank of Mobile, Williams, Deacon & Co. had acquired all the right they can assert to the proceeds of said bills, by meeting the advance-drafts of the Bank of Mobile. Danner, president of each corporation, had knowledge of the said lien held by Williams, Deacon & Co. on said bills, for it was under his direction the drafts had gone forward, and the proceeds, thus anticipated, had been turned into the coffers of the Bank of Mobile. Was this knowledge on the part of Danner, notice to each of the corporations of which he was president, of the nature and extent of the claim held by Williams, Deacon & Co. on the said bills? And, we may ask, what right had the Bank of Mobile to receive payment of the bills, incumbered as they then were? And what right had the Danner Land and · Lumber Company to pay the bills to the Bank of Mobile, if chargeable with notice of Williams, Deacon & Co's. lien? These inquiries raise the question, whether the Land and Lumber Company has discharged itself from the payment of the bills, by the alleged payment to the Bank of Mobile. It is not necessary we should decide this question.

[Williams, Deacon & Co. v. Jones.]

Taken in its broadest aspect—that which best promotes the interest of Williams, Deacon & Co.—the Danner Land and Lumber Company paid, and the Bank of Mobile received payment of said bills, in their joint wrong, when the money was due and payable to Williams, Deacon & Co. If this be the true state of the case, then the Land and Lumber Company is not discharged by such payment from the obligation to pay, unless Williams, Deacon & Co. ratify the bank's unauthorized collection. Ratifying it, however, Williams, Deacon & Co. would be held to have discharged the Land and Lumber Company as their debtor, and to have agreed to look alone to the Bank of Mobile for payment. Considered on this hypothesis, what right or claim have the complainants against the Bank of Mobile, and against the property received in payment from the Land and Lumber Company? Was the property received by the bank charged with a trust? If the payment to the Bank of Mobile had been made in money, then, if ratified, there would have been created only a debt or duty resting on the bank to pay to Williams, Deacon & Co., with no trust or lien on anything to secure its payment, for money has no earmark. The payment, however, was made in property, which remained in specie, so far as we are informed, when the bank assigned to Jones. It is still undisposed of and unconverted, so far as we know. To the extent this property represents the debt evidenced by said fifteen bills of exchange, if the facts are correctly set forth in the cross-bill, the Bank of Mobile is out nothing. True, it parted with its cash when the bills were discounted, but it received it back, when Williams, Deacon & Co. accepted and paid the bank's drafts, drawn on the credit the remitted bills furnished. On the averments of the cross-bill, Williams, Deacon & Co., by ratifying the said collection by the bank from the Land and Lumber Company, would become entitled, *ex æquo et bono*, to so much of the proceeds of the property received by the bank from the Land and Lumber Company, as was in payment of said fifteen bills of exchange. The bank was not entitled to such proportionate proceeds, for it paid nothing for them. If, then, the bank assumed to collect these bills of exchange without authority, and received payment in property, promising, in consideration thereof, to pay the bills, thus relieving the Land and Lumber Company from all liability to pay said bills; and if the bank, becoming insolvent, fails to pay said bills, and thus leaves the debt resting on the Land and Lumber Company, is there any reason why the said Land and Lumber Company can not hold the bank, and its assignee, trustees of the property thus failed to be applied, and compel them to account for the proportion of the property, which was turned over in payment of the debt

evidenced by the bills of exchange? And is not this on the theory, that by the insolvency of the bank, Williams, Deacon & Co., or the Land and Lumber Company, as the case may be, is armed with the option of having the property declared trust property, and applied to the purpose for which it was turned over; or, if renounced by the beneficiary, of having it restored to the grantor?

All that is said on the point last discussed, must be considered as resting on the hypothesis, that Williams, Deacon & Co. paid the advance drafts of the Bank of Mobile, on the faith and credit inspired by the possession of said bills of exchange accepted by Shadboldt & Son. There need have been no express agreement to this effect. It is enough, if it was in accordance with their usual course of dealings. Of course, if the advance was simply a loan, entirely uninfluenced by the Shalboldt acceptances, then Williams, Deacon & Co. are simple creditors of the insolvent bank, without lien or security, and without any recourse against the Danner Land and Lumber Company, or against the property paid by it to the bank.

We have shown that, in one category, the complainants in the cross-bill have no interest whatever in the fund they are seeking to subject. That category is, that the advance was made as an independent loan, in no manner connected with, or dependent on the Shadboldt acceptances. A second category is that set forth in the cross-bill—that the advance was made on the faith of the Shadboldt acceptances, and relying on their collection for reimbursement. This, we have intimated, would secure to Williams, Deacon & Co. a lien on those bills and their proceeds, paramount to all right of control and direction the Bank of Mobile might attempt to assert. We have further intimated, if this be the true state of the case, that the Bank of Mobile had no right to receive payment of the bills; but having done so, it rested with Williams, Deacon & Co. whether they would ratify such collection, and claim their proportionate share of the property. We have said that, in the event of ratification by Williams, Deacon & Co., neither they, nor any one else, has any longer any claim against the Land and Lumber Company based on said bills, for they would thereby have become paid. This rests on very simple principles. Ratification of an unauthorized act must be entire. It can not be partial, accepting the good, and rejecting the unacceptable. No one will be permitted to claim rights as conferred by a grant, conveyance, or other contract, without adopting the whole contract, and surrendering any and all seeming rights which the instrument appoints to another. A claim can not be asserted under, and as conferred by an instrument or contract, in connection with another which antagonizes the instru-

[Knox v. Wilson.]

ment or contract, or any of its conferred rights.—Wharton on Agency, § 72; Perry on Trusts, § 596; *Harrison v. Gardner*, 10 Ala. 185; *McReynolds v. Jones*, 30 Ala. 101; *Hatchett v. Blanton*, 72 Ala. 423.

The cross-bill in this case sets forth, in unmistakable terms, that Williams, Deacon & Co. renounce and repudiate the alleged settlement and payment of the bills by the Land and Lumber Company to the Bank of Mobile, and that they have instituted suits against Shadboldt & Son as acceptors, and the Land and Lumber Company as drawers of said bills. Those suits, it is averred, were pending when the cross-bill was filed. The bills had been previously protested for non-payment, and notice given to the drawer. Williams, Deacon & Co. have thus shown by their own averments that they repudiate the alleged payment, and seek redress on the bills, as living evidences of debt. This is incompatible with the relief they seek by their cross-bill, and the chancellor did not err in sustaining the demurrer to it. It should be stated that this rule of election would not probably apply, if the Land and Lumber Company had merely conveyed the property as security for the liability. The conveyance was absolute in form, and was made and accepted as payment, not as security.

We have not considered whether appeal is the proper mode of bringing the chancellor's interlocutory ruling on the cross-bill before us. Nor have we considered, in the event appeal will not lie, whether appellants could obtain redress by *mandamus*, if they had shown a right to the relief claimed in their cross-bill. They have failed to show themselves entitled to the relief they pray, and we need not consider whether, in the present stage of the litigation, they are entitled to any, and, if any, to what form of redress.

Affirmed.